**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| WALGREEN CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 14-123-GMS |
| | ) | |
| CVS CAREMARK CORPORATION and | ) | JURY TRIAL DEMANDED |
| CVS PHARMACY, INC., | ) | |
| | ) | **REDACTED – PUBLIC VERSION** |
| Defendants. | ) | |
| | ) | |

| | | |
|---|---|---|
| WALGREEN CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 14-124-GMS |
| | ) | |
| RITE AID CORPORATION and | ) | |
| RITE AID HDQTRS. CORP., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

| | | |
|---|---|---|
| WALGREEN CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 14-125-GMS |
| | ) | |
| SHOPKO STORES OPERATING CO., LLC | ) | |
| and MSCRIPTS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**WALGREEN CO.'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR**
**PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

I.    WALGREENS IS LIKELY TO SUCCEED ON THE MERITS ......................................5

      A.    Defendants Infringe the 530 Patent.........................................................................5

            1.    Step 1: Construction of the 530 Patent ......................................................5

            2.    Step 2: Comparing the Claims to the Infringing
                  Systems .......................................................................................................6

                  a.    Defendants    CVS,    Rite-Aid,    and
                        Shopko/mscripts Infringe the 530 Patent........................................7

                  b.    Sample    Infringement    Analysis—CVS
                        Infringes Claim 14 ..........................................................................8

      B.    The 530 Patent is Valid and Enforceable.............................................................11

II.   WALGREENS HAS BEEN, AND WILL CONTINUE TO BE,
      IRREPARABLY   HARMED   WITHOUT   PRELIMINARY
      INJUNCTIVE RELIEF........................................................................................................12

      A.    Patent Infringement Damages Would be Very Difficult to
            Quantify ................................................................................................................12

      B.    Defendants'    Continued    Infringement    Will    Cause
            Walgreens to Lose Actual and Potential Customers,
            Valuable Market Share, and Revenue for Products Not
            Covered by the 530 Patent ....................................................................................13

            1.    Walgreens Will Continue to Lose Prescription
                  Refill Business, Revenue and Customers Due to
                  Defendants' Infringement ..........................................................................14

            2.    Walgreens Will Continue to Lose Significant, Non-
                  Prescription Business and Revenue—And Some of
                  Its Most Profitable Customers—Due to Defendants'
                  Infringement..............................................................................................14

      C.    Defendants' Continued Copying Will Irreparably Harm
            Walgreens' Goodwill and Its Reputation as a Differentiated
            Innovator in the Pharmacy Industry......................................................................15

      D.    Defendants'    Infringement    Interferes    with    Walgreens'
            Ability to Control Use and Dissemination of the Patented
            Technology ............................................................................................................17

      E.    Walgreens Has Expended Tremendous Resources on its
            Technology and Innovation, Including the Refill-By-Scan
            Technology ............................................................................................................18

      F.    A Preliminary Injunction Will Deter Other Existing and
            Potential Infringers................................................................................................18

i

Case 1:14-cv-00123-GMS   Document 18   Filed 03/21/14   Page 3 of 28 PageID #: 1551

| | | |
|---|---|---|
| III. | THE BALANCE OF THE HARDSHIPS HEAVILY FAVORS WALGREENS | 19 |
| IV. | THE PUBLIC INTEREST DEMANDS PRELIMINARY INJUNCTIVE RELIEF | 20 |
| V. | SECURITY | 20 |

ii

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Sandoz, Inc.*,
  544 F.3d 1341 (Fed. Cir. 2008) ................................................................. 13

*Advanced Software Design Corp. v. Fiserv, Inc.*,
  641 F.3d 1368 (Fed. Cir. 2011) ................................................................... 6

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
  678 F.3d 1314 (Fed. Cir. 2012) ................................................................. 14

*Aria Diagnostics, Inc. v. Sequenom, Inc.*,
  726 F.3d 1296 (Fed. Cir. 2013) ................................................................. 13

*AstraZeneca LP v. Apotex, Inc.*,
  633 F.3d 1042 (Fed. Cir. 2010) ................................................................... 5

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
  664 F.3d 922 (Fed. Cir. 2012) ................................................................... 12

*Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*,
  631 F.3d 1279 (Fed. Cir. 2011) ................................................................ 6, 7

*Douglas Dynamics, LLC v. Buyers Products Co.*,
  717 F.3d 1336 (Fed. Cir. 2013) ....................................................... 5, 16, 19

*Hoffer v. Microsoft Corp.*,
  405 F.3d 1326 (Fed. Cir. 2005) ................................................................... 6

*Hybritech, Inc. v. Abbott Labs.*,
  849 F.2d 1446 (Fed. Cir. 1988) ................................................................. 18

*In re Beauregard*,
  53 F.3d 1583 (Fed. Cir. 1995) ..................................................................... 7

*Microsoft Corp. v. i4i Ltd. P'ship*,
  131 S. Ct. 2238 (2011) ............................................................................... 11

*Oakley, Inc. v. Sunglass Hut Int'l*,
  316 F.3d 1331 (Fed. Cir. 2003) ................................................................... 5

*Power-One, Inc. v. Artesyn Techs., Inc.*,
  599 F.3d 1343 (Fed. Cir. 2010) ................................................................. 11

*Rite-Hite Corp. v. Kelley Co., Inc.*,
  56 F.3d 1538 (Fed. Cir. 1995) ................................................................... 12

*Sanofi-Synthelabo v. Apotex, Inc.*,
  470 F.3d 1368 (Fed. Cir. 2006) ................................................................. 20

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ................................................................... 6

*Versata Software, Inc. v. SAP Am., Inc.*,
  717 F.3d 1255 (Fed. Cir. 2013) ................................................................... 7

**STATUTES**

35 U.S.C. § 102 ................................................................................................................. 11

35 U.S.C. § 271(a) ............................................................................................................. 6

35 U.S.C. § 284 ................................................................................................................. 12

## NATURE AND STAGE OF PROCEEDINGS

Walgreen Co. ("Walgreens") filed suit on January 31, 2014 against CVS Pharmacy, Inc. ("CVS"), Rite Aid Corporation and Rite Aid Hdqtrs. Corporation ("Rite Aid"), Shopko Stores Operating Co., LLC ("Shopko") and mscripts, LLC ("mscripts") (collectively, "Defendants"). Walgreens now moves for a preliminary injunction to halt the continued irreparable harm resulting from Defendants' infringement of U.S. Patent 8,626,530 ("530 patent") via their respective mobile applications ("apps").

## SUMMARY OF ARGUMENT

This exceptional case warrants a preliminary injunction. Unless Defendants are enjoined, Walgreens will continue to be irreparably injured in ways that conventional money damages can never fully repair. The bases for this motion are as follows:

1.      Walgreens was recently awarded the 530 patent for its invention of a highly popular, award-winning mobile application technology—called Refill-By-Scan—that allows customers to order prescription refills by scanning the barcode on their prescription bottle with their mobile devices. (*See* Ex. 1 (530 patent); Ex. 2 (assignment).)[1] Soon thereafter, Walgreens sued Defendants for infringement.

2.      As discussed herein and in the declaration of Dr. Scott M. Nettles, Walgreens is likely to prove infringement at trial. It is also likely to succeed on the issue of patent validity.

3.      The irreparable injury caused by Defendants' infringement is exceptional and enormous. Walgreens' and Defendants' apps are given away without charge, making conventional patent damages extraordinarily difficult to compute because there are no traditional "patented sales." Nevertheless, customers using the apps are statistically likely to spend far more

---

[1] Unless otherwise noted, the exhibits referenced herein are attached to the Declaration of Daniel S. Stringfield, dated March 20, 2014, and filed contemporaneously herewith.

on a pharmacy's goods than are other customers. Walgreens' ongoing losses of sales and market
share are thus extremely difficult to recompense under the patent laws. Certain Defendants' apps
have features designed to encourage customers to shift their business to their own pharmacies,
thus raising the likelihood of Walgreens' losses. Defendants' copying has been so rapid and so
effective that third parties have confused at least one Defendant as the originator of Refill-By-
Scan, irreparably harming Walgreens' reputation as a differentiated innovator.

4.      The balance of hardships dramatically favors Walgreens. In contrast to the
irreparable harm to Walgreens, the Defendants each have an existing option within their apps to
refill prescriptions by manually entering a prescription number in a non-infringing manner. An
injunction will permit manual entry to continue, while only barring Defendants from using the
patented Refill-By-Scan technology.

5.      The public interest also favors Walgreens. There is a strong public interest in
prohibiting infringement of valid patents. That is exactly the case here.

## INTRODUCTION AND STATEMENT OF FACTS

1.      Walgreens was founded as a single neighborhood drugstore in 1901. (Ex. 3 at 1.)
Its founder, Charles R. Walgreen, Sr., opened a second store in 1909. Today there are over 8,000
Walgreens drugstores. (*Id.* at 5.) Mr. Walgreen was a visionary who created his own line of drug
products to better serve the public by ensuring high quality and low prices. (*Id.* at 1.)

2.      For over a century, Walgreens has built on its successful history of innovation and
of reinventing the traditional drugstore model. As an example, in 1968, Walgreens became the
first major drug chain to put its prescriptions into child-resistant containers, long before that was
required by law. (*Id.* at 2.) In 1981, Walgreens rolled out its innovative "Intercom" system of
networked computers, becoming the first drugstore chain to connect all of its pharmacy
departments by satellite. (*Id.*) This solidified Walgreens as an innovator in computerized

prescription filling, refilling, and tracking. In three of the last four years, Walgreens was named

one of the ten most innovative healthcare companies. (*See* Ex. 4 at 2, 4, 9.) Walgreens has been

recognized as having "pioneered prescriptions . . . in mobile commerce." (Ex. 5; *see also* Ex. 6 at

1 ("Walgreens [is a] forward-thinking technology company behind a mobile application that can

refill your drug prescription by snapping a photo of the barcode on the bottle.").)

      3.    Walgreens continues to protect its position as a leader in healthcare and

pharmacy technology by investing heavily in software development projects, averaging over

$350M in capital expenditures per year for 2008 to 2013. (*See* Shaffer Decl. ¶ 25.)

      4.    Walgreens' Refill-By-Scan feature, the technology at the heart of this litigation,

was added to Walgreens' mobile app in September 2010 and has become a major success. Prior

to Refill-By-Scan, Walgreens' app was downloaded an average of ▉▉▉▉▉ per month. (*See*

*id.* ¶ 17.) In the second full month after the Refill-By-Scan technology was available on both the

Android phone and iPhone platforms, the Walgreens app for those two platforms was

downloaded almost ▉▉▉▉▉▉▉▉▉▉▉. (*See id.* ¶ 18.) By the end of that month,

the Refill-By-Scan technology had become the favorite app feature of Walgreens' Android app

customers, according to a Walgreens social media inquiry. (*See* Ex. 7.) In the three years

thereafter, the Walgreens app for those two platforms was downloaded an average of over

▉▉▉▉▉▉ per month. (*See* Shaffer Decl. ¶ 19.) It has now been downloaded more than

twenty-one million times on just those two platforms, with over 97% of those downloads coming

after the Refill-By-Scan technology was introduced. (*See id.* ¶¶ 20-21.) The Refill-By-Scan

technology is now used by Walgreens to receive about ▉▉▉▉ prescription refill orders per day.

(*See id.* ¶ 21.) Over ▉▉▉▉▉▉ total orders have been placed using Refill-By-Scan. (*Id.* ¶

22.) ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

████████████████████████████████████████████████████

████████████████████████████ (*See* Hyet Decl. ¶ 6.)

5.     In November 2011, about one year after Walgreens added Refill-By-Scan to its mobile app, CVS added its "Scan Your Refill" feature with refill by scan capability to its own app. (*See* Ex. 8 at 1, Press Release, *New CVS/pharmacy Mobile Features Offer Convenience for On-The-Go Shoppers*.) CVS's Chief Marketing Officer touted "Scan Your Refill" as a "**new mobile innovation[]** that make[s] it easier for [CVS's] customers to order refills." (*Id.* (all emphasis herein is added unless otherwise expressly stated).) CVS itself touts "Scan Your Refill" as making "refilling prescriptions easier than ever." (Nettles Decl. App'x A-1 ¶ 6.)

6.     Rite Aid introduced an app with refill by scan technology in about March 2012. (*See* Ex. 9 at 1 ("Rite Aid has launched an official mobile app offering one-click prescription refill scanning . . . .").) The press commented on the importance of Walgreens' Refill-by-Scan technology, as adopted by Rite Aid. (*See*, *e.g.*, Ex. 10 at 1, *Rite Aid Plays Catch Up With Rx Refill App* ("This week Rite Aid launched smartphone apps . . . that let[] customers refill their prescriptions by scanning the medication bottle with their device's camera. Walgreens launched a similar app in November 2010."); Ex. 11, *Rite Aid Launches Its Own App, Lets You Refill Prescriptions by Scanning Your Bottle's Label, Among Other Cool Features*.)

7.     Shopko's mobile app has included refill by scan technology since January 2012. (*See* Ex. 5, *Shopko Is Catching Up in M-Commerce to Rivals Walgreens & CVS*.) Again, the press recognized the importance of the Walgreens Refill-by-Scan technology as adopted by Shopko. (*See id.* ("Now Shopko Stores Operating Co. is getting in the mobile prescription game with an app . . . that enables customers to refill prescriptions, including via bar code scanner.").) Shopko's President, Chairman and CEO, Paul Jones, explained that Shopko's app, by including

4

"the features most important to our customers," made "filling prescriptions on [] mobile devices quick and easy" and that it was offered "in direct response to consumer demand." (*See id.*)

8.      Defendant mscripts is the developer of the Shopko mobile app, which has included refill by scan technology since at least January 2012. As Shopko explained, its mobile apps were "built by mscripts LLC." (*See id.*)

## ARGUMENT

As set forth herein and in the declarations submitted herewith, a preliminary injunction should issue here because: (1) Walgreens has a reasonable likelihood of success on the merits at trial, (2) Walgreens is being, and will continue to be, irreparably harmed absent an injunction, (3) the balance of the hardships favors an injunction, and (4) an injunction would favorably impact the public interest. *See AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1050 (Fed. Cir. 2010).

## I.      WALGREENS IS LIKELY TO SUCCEED ON THE MERITS

To demonstrate a likelihood of success, Walgreens need only show that, in light of the presumptions and burdens that will exist at trial on the merits, (1) the Defendants likely infringe the 530 patent, and (2) the 530 patent will likely withstand challenges to validity and enforceability. *See id.* Walgreens is likely to succeed on the merits because the Defendants infringe at least one claim of the 530 patent, and the 530 patent is valid and enforceable.

### A.      Defendants Infringe the 530 Patent

Determining infringement involves two steps. First, the Court construes the asserted claims. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003). Second, the Court compares the construed claims to the allegedly infringing device, process, or system. *Id.*

#### 1.      Step 1: Construction of the 530 Patent

Words in a claim are generally given their ordinary and customary meaning. *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1342 (Fed. Cir. 2013). Here, the terms in

asserted claims 10, 12, 13, 14, 15, 16, 18, and 19 of the 530 patent are used in a manner that is

consistent with their ordinary usage. (*See* Nettles Decl. ¶ 59.) Thus, the claim terms should be

given their plain and ordinary meaning, interpreted in light of the specification as viewed by one

of ordinary skill in the art. For example, the 530 patent's specification identifies "barcode" as

inclusive of all types of barcodes, including conventional rectangular segment barcodes, two-

dimensional QR codes or matrix barcodes. (*See* Ex. 1 at 18:31-35).[2]

## 2.    Step 2: Comparing the Claims to the Infringing Systems

Infringement occurs when a party "makes, uses, offers to sell, or sells any patented

invention, within the United States or imports into the United States any patented invention

during the term of the patent." *See* 35 U.S.C. § 271(a) (2012). There are two types of patent

claims asserted in this preliminary injunction proceeding—system claims (claims 14-16, 18, and

19, some or all of which are presently asserted against all Defendants) and "Beauregard" claims

(claims 10, 12, and 13, presently asserted against CVS only).

To "use" a claimed system, and therefore infringe, "a party must put the invention into

service, i.e., control the system as a whole and obtain benefit from it." *Centillion Data Sys., LLC

v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011). But a user need not have

"physical or direct control over each individual element of the system." *Id.*; *see Uniloc USA, Inc.

v. Microsoft Corp.*, 632 F.3d 1292, 1309 (Fed. Cir. 2011) (holding that Defendant Microsoft

"used" the claimed invention although "Microsoft did not supply or use the end users'

computers"); *see also Advanced Software Design Corp. v. Fiserv, Inc.*, 641 F.3d 1368, 1374

(Fed. Cir. 2011). Here, Defendants directly infringe independent claim 14 by using their

---

[2] There is a typographical error in claim 14 that the Court may and should correct by construing
"w enabled mobile device" to mean "web enabled mobile device." (*See* Ex. 1, 530 patent at 25:5;
Ex. 12, Prosecution History at FH0292-93 (claim was correctly submitted to Patent Office)); *see
Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1331 (Fed. Cir. 2005).

respective systems "*for receiving a refill order* for one or more prescription medications." (Ex. 1 at 24:31-32.) Defendants control their respective systems as a whole and obtain benefit from them, at least by receiving refill orders and receiving revenue from refill sales. *See Centillion*, 631 F.3d at 1284.

Beauregard claims are those that recite "computer programs embodied in a tangible medium." *In re Beauregard*, 53 F.3d 1583, 1584 (Fed. Cir. 1995). Beauregard claims are directly infringed when, for example, a party makes and/or distributes software applications. *See*, *e.g.*, *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1262-63 (Fed. Cir. 2013) (infringing Beauregard claims with software). Here, CVS not only "makes" its infringing apps, but it also distributes the app via an agency relationship with online marketplaces, such as the Apple iTunes App Store and Google Play. (*See* Ex. 13 §§ 1.2, 7.1 ("You, [the app developer,] appoint Apple and Apple Subsidiaries as Your legal agent . . . .")); Ex. 14 §§ 4.6, 7.1.) By its distribution, CVS also "uses" its infringing apps to, among other things, generate refill orders.

> ### a.    Defendants CVS, Rite-Aid, and Shopko/mscripts Infringe the 530 Patent

To assess infringement, Walgreens turned to Dr. Scott M. Nettles, an expert in the field. He holds a Ph.D. in Computer Science from Carnegie Mellon University. He has extensive industry and academic experience developing software. Dr. Nettles has been a professor for nearly two decades, teaching courses in networking, operating systems, and computer programming with a focus on abstractions, Java, and data structures. His research has included mobile and wireless networking. (*See* Nettles Decl. ¶¶ 4-10.) Dr. Nettles analyzed the 530 patent, reviewed the 530 patent's file history, used each of the Apps on their respective platforms (*e.g.*, Android, iPhone), conducted protocol tests using the apps, and took hundreds of screenshots of his results. (*See id.* ¶¶ 12-37.) He also used, or at his direction had another use, two pieces of

commonly-available software to examine network activity and data exchanged while operating the apps. (*See id.* ¶¶ 38-44.)

Dr. Nettles' findings regarding infringement by each of the Defendants are detailed in his declaration and the exhibits and appendices thereto.  Dr. Nettles concludes that CVS infringes at least claims 10, 12–16, 18, and 19 of the 530 patent, that Rite Aid infringes at least claims 14, 18, and 19 of the 530 patent, and that Shopko/mscripts infringe at least claims 14, 18, and 19 of the 530 patent. (*See id.* ¶ 3.) His declaration—with exhibits and appendices including, *inter alia*, numerous screen shots evidencing Defendants' infringement—totals hundreds of pages. To illustrate Defendants' infringement, Walgreens provides below an exemplar infringement analysis of claim 14 (infringed by all Defendants) by CVS (the largest Defendant).

### b.    Sample Infringement Analysis—CVS Infringes Claim 14

CVS uses a "system for receiving a refill order for one or more prescription medications," as recited in the preamble of claim 14. (*See* Nettles Decl. App'x A-1 ¶ 6 (CVS: "Our scanning tool makes refilling prescriptions easier than ever.").) That system includes "a communication network," *e.g.*, the Internet, as recited in claim element 14(a). (*Id.* ¶ 12; *see id.* ¶ 2 (dividing claim 14 into elements for ease of reference).) The system also includes "one or more web enabled mobile devices, each . . . having a processor, a memory coupled to the processor and a camera coupled to the processor and the memory," *e.g.*, an iPhone® having an A7 processor, 16GB of memory, and an 8 megapixel autofocus camera, as recited in element 14(b). (*Id.* ¶ 18.) The system includes "one or more server computers communicatively coupled to the communication network and the one or more web enabled mobile devices, *e.g.*, one or more CVS server computers coupled to the Internet and the iPhone®, as recited in element 14(c). (*Id.* ¶ 22.) Finally, the system includes "one of the one or more web enabled mobile devices having an application stored thereon," *e.g.*, the CVS/pharmacy app, as recited in element 14(d). (*Id.* ¶ 26.)

8

These elements are the environment in which CVS uses its system for receiving refill orders for prescription medications.

As recited in elements 14(d)(1)-(d)(8), and as explained by Dr. Nettles, the CVS/pharmacy app "is configured to [(d)(1) **cause** the processor to display an interface in the application executing on the web enabled mobile device, the interface for selection of a prescription refill option"—*i.e.*, the app is configured to cause the processor to display an interface for selecting "Scan Your Refill." (*See id.* ¶¶ 29-32, Fig.10.) The app is also configured to "[(d)(2)] **receive** an input at the processor from the customer indicating, via the application, a selection of the prescription refill option"— e.g., the app was configured to receive a customer input from a touching of the "Scan Your Refill" option. (*Id.* ¶¶ 34-35, Fig. 10.) The app is configured to "[(d)(3)] **cause** the processor to activate the web enabled mobile device's camera for scanning of a barcode"—*e.g.*, Dr. Nettles touched a "Scan Your Refill" option and the app caused the processor to activate the iPhone's camera for scanning of a barcode. (*Id.* ¶¶ 38-40, Fig. 13.)



*Nettles Decl. App'x A-1  Fig 10*

Figure 14 from Dr. Nettles' Declaration shows that the app is configured to "[(d)(4)] **cause**, automatically or upon a user input, the camera to capture an image, displayed in the application, of the barcode indicating at least a prescription number [**below, center**], the prescription number corresponding to a prescription medication and a patient [**below, right**]." (*Id.* ¶¶ 42-51, Fig. 14.)



*Nettles Decl. App'x A-1, Fig. 13*



*Nettles Decl. App'x A-1, Fig. 14*

Dr. Nettles then utilized Wireshark and Fiddler network analyzer software to confirm that the app is configured to "[(d)(5)] **cause** the processor to transmit from the application . . . to at least one  . . . server computer[], data indicative of at least the prescription number so that the server can automatically validate the prescription number . . .," "[(d)(6)] **receive** information at the web enabled mobile device, . . . at least a portion of which is to be displayed in an order review page of the application," and "[(d)(7)] **cause** the processor to generate a display in the application including the at least the portion of received information in an order review page," "wherein the information includes the prescription number and a pharmacy location where the prescription medication . . . will be filled." (*Id.* ¶¶ 53-57, 61-65, 69-70, Figs. 19, 28.) Finally, the app is configured to "[(d)(8)] **transmit** from the web enabled mobile device, in response to an action by the customer viewing the displayed order review page [*e.g.*, "Submit Order," Fig. 28], to at least one of the one or

*Excerpted from Nettles Decl. App'x A-1, Fig. 19*

more server computers and via the communication network, a confirmation to refill the prescription." (*See id.* ¶¶ 75-81.)

CVS infringes claim 14. The system it uses meets all elements of claim 14. It exercises control over this system. And it obtains benefit at least in the form of receiving refill orders for prescription medications and sales revenue from such orders. (*See id.* ¶ 81.)

### B.  The 530 Patent is Valid and Enforceable

The 530 patent enjoys the statutory presumption of validity. *See* 35 U.S.C. § 282. It can be proven invalid only by clear and convincing evidence. *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011). This presumption is strengthened in this case because the grant of the 530 patent occurred after the Patent Office carefully examined the 530 patent's application for nearly two years. During that time, the Patent Office issued three Office Actions and applied eight different references to the pending claims. (*See* Ex. 12 at FH0090-123, 173-214, 242-81.) Notably, the application's claims were never asserted to be anticipated by a single reference under 35 U.S.C. § 102. (*See id.*) All questions of patentability based on the Patent Office's multi-reference Section 103 rejections were overcome by Walgreens. (*See id.* at FH0300-08.)

The evidence of nonobviousness based on the objective factors is overwhelming. It includes outstanding commercial success, (*see* Hyet Decl. ¶¶ 6, 9-10, 14; Shaffer Decl. ¶¶ 22-23; *see also* Ex. 15 at 9:11-24), praise by others in the industry (including competitors and the press), (*see* Exs. 5-7, 16-29), as well as copying by the Defendants. (*See* Exs. 5, 10, 11); *see Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1352 (Fed. Cir. 2010) (affirming validity of the patent-in-suit; holding that "evidence of praise in the industry that specifically related to features of the patented invention" and defendant's copying "demonstrate[d] the unobviousness of the invention"). The evidence of copying is compelling. In a "me too" fashion, Defendants incorporated refill by scan technology into their apps, and industry articles described Rite Aid

11

and Shopko as having copied Walgreens' Refill-By-Scan technology. (*See supra* Intro. ¶¶ 5-8.)

Also, the appearance and names of the refill by scan technology as implemented by at least CVS

and Rite Aid are strikingly similar to Walgreens' commercial embodiment. (*See*, *e.g.*, Ex. 30; Ex.

11 (Rite Aid adopted Walgreens' name for the feature ("Refill By Scan," shown in third central

screenshot)).) Moreover, simultaneous with mscripts' launch of the technology, its CEO touted

Walgreens' Refill-By-Scan as a market driver. (*See* Ex. 15 at 9:11-24.)

## II.   WALGREENS HAS BEEN, AND WILL CONTINUE TO BE, IRREPARABLY HARMED WITHOUT PRELIMINARY INJUNCTIVE RELIEF

### A.   Patent Infringement Damages Would be Very Difficult to Quantify

This is not a typical patent case where the harm to plaintiff can be quantified in terms of

infringing units sold. Here, Walgreens and Defendants provide the apps to their customers for

free.[3]  Thus, there are no conventional "lost profits" that Walgreens makes from the sale of a

patented product which it could recover under 35 U.S.C. § 284. And there is no conventional

reasonable royalty under 35 U.S.C. § 284 because Defendants give away their apps for free and

sales of items not covered by the 530 patent are not included in a conventional royalty base. *See*

*Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995) (absent application of

the "entire market value rule," products not covered by the patent-in-suit are not included in the

royalty base). There is also no established royalty rate, as Walgreens has chosen not to license

the 530 patent to competitors. (*See* McCauley Decl. ¶ 31.) Thus, it would be very difficult to

award damages "adequate to compensate" Walgreens for Defendants' infringement. For at least

this reason, Walgreens will be irreparably harmed if Defendants are not preliminarily enjoined.

*See Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("[T]he

---

[3] Defendant mscripts develops mobile apps including the refill by scan technology for its clients (such as Defendant Shopko) on a contract basis. (*See* Ex. 15 at 2:5-7.) In turn, mscripts' clients (e.g., Shopko) give the software away to their own customers. As such, no revenue is derived directly from the give-away distribution of the Shopko app.

irreparable harm inquiry seeks to measure harms that no damages payment, however great, could

address.").

**B.      Defendants' Continued Infringement Will Cause Walgreens to Lose Actual and Potential Customers, Valuable Market Share, and Revenue for Products Not Covered by the 530 Patent**

The Walgreens app, incorporating the Refill-By-Scan technology, is a valuable tool to

acquire, maintain, and build upon customer relationships. (*See* McCauley Decl. ¶ 16.)

Defendants' continued misappropriation of Walgreens' patented technology during the pendency

of this suit will irreparably harm Walgreens by allowing Defendants to continue poaching

Walgreens' market share,[4] customers, and business opportunities. *See Aria Diagnostics, Inc. v.

Sequenom, Inc.*, 726 F.3d 1296, 1304 (Fed. Cir. 2013) ("[L]oss of goodwill, damage to

reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.")

(internal quotation omitted); *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir. 2008)

(evidence of irreparable harm may include loss of market position and opportunities; loss of

revenue, and research and development).

Mobile apps provide a new gateway for retail companies to access and interact with their

current and prospective customers. (*See* McCauley Decl. ¶ 9.) For that access, companies will

not only gladly provide free mobile apps to their customers, but they will try to make their

mobile apps as attractive as possible by including "must-have" features that motivate their own

customers—and, they hope, the customers of their competitors—to adopt (*i.e.*, download and

---

[4] Walgreens is the largest pharmacy chain in the U.S., with over 8,000 pharmacies, CVS has over 7,500 U.S. pharmacies, Rite Aid has over 4,500, Shopko has over 250 and other mscripts customers combined have at least about 2,000 stores. (Exs. 31-33.) The combined size of Defendants (over 13,000 pharmacies) eclipses Walgreens and is a serious threat to Walgreens' market share. Moreover, insofar as Walgreens is present in every state where Defendants have stores, Defendants' expansion will necessarily come at the expense of Walgreens' market share. (*See* Ex. 31-33.)

utilize) their respective apps. (*See id.* ¶¶ 13-14.) Walgreens' Refill-By-Scan technology, covered

by the 530 patent, (*see* Nettles Decl. App'x D), has become one such "must-have" feature

driving customer adoption of Walgreens' app.[5] (*See* McCauley Decl. ¶ 16.) In fact, 97% of the

over 21 million downloads of the Walgreens mobile app came after the integration of the

patented Refill-By-Scan technology, ████████████████████████████████████

████████████████ (*See supra* Intro. ¶ 4.)

> **1.     Walgreens Will Continue to Lose Prescription Refill Business,
> Revenue and Customers Due to Defendants' Infringement**

Walgreens also realizes revenue in the form of increased prescription refill business via

its patented Refill-By-Scan technology. ████████████████████████████████

████████████████████████████████████ (*See* Hyet Decl. ¶

6.) But these prescription products are not covered by the 530 patent.

In addition to offering infringing refill by scan technology through their apps, Defendants

have implemented app features to divert Walgreens' customers. For example, CVS and Rite Aid

specifically include tools in their apps to transfer prescriptions from Walgreens to their

competing pharmacies. (*See id.* ¶¶ 15-18; Exs. 34-35.)

> **2.     Walgreens Will Continue to Lose Significant, Non-Prescription
> Business and Revenue—████████████████████████
> ████████—Due to Defendants' Infringement**

The ease of refilling prescriptions is important to pharmacy customers. Indeed, sixty-four

percent of pharmacy customers have identified the ease of the refill process as an important

factor in selecting a pharmacy, second to only whether a pharmacy accepts the customer's

insurance. (*See* Hyet Decl. ¶ 23.) Therefore, it is not surprising that Refill-By-Scan is the most

---

[5] To the extent that a causal nexus between Defendants' infringement and harm to Walgreens is
required for a preliminary injunction to issue, it is present here. *See Apple, Inc. v. Samsung Elecs.
Co., Ltd.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012).

popular feature of Walgreens' mobile app and has been a tremendous driver of the download and use of the app by Walgreens' customers. (*See supra* Intro. ¶ 4.)

████████████████████████████████████████████

████████████ (*See* Hyet Decl.  ¶ 6.) Customers who transact at Walgreens in two ways, *i.e.*, through the Walgreens mobile app and at the stores, spend four times as much as customers who transact at stores only. (*See id*. ¶¶ 9, 11.)  And customers who transact at Walgreens in three ways, *i.e.*, through the Walgreens mobile app, in-person, and also through its website, spend six times as much as customers who only transact at the store. (*See id*. ¶¶ 10-11; *see also* Ex. 36.) And these customers—whose increased spending on items beyond prescription drugs spans virtually everything, from vitamins and cosmetics to diapers and sunscreen—█████████

██████████████████ (*See* Hyet Decl. ¶ 12-13.) Of course, these customers are therefore the ones most coveted by Walgreens' competitors. To that end, Defendants also use their apps to ply current and prospective customers with store loyalty programs and weekly advertisements selling goods not covered by the 530 patent. (*See* McCauley Decl. ¶ 15.)

In terms of market share, customer relationships, and revenue from the sale of goods, the benefits of the patented technology to Walgreens is incalculable. Thus, Walgreens will be irreparably harmed if Defendants are allowed to continue increasing their respective market shares during the pendency of this litigation by continuing to misappropriate Walgreens' patented technology.

**C.      Defendants' Continued Copying Will Irreparably Harm Walgreens' Goodwill and Its Reputation as a Differentiated Innovator in the Pharmacy Industry**

Walgreens' effort and innovation in developing the Refill-By-Scan technology cultivated immense goodwill with its customers. (*See supra* Intro. ¶ 2.) Walgreens' efforts paid off. Customers, press, industry analysts, and other industry players, have repeatedly praised

15

Walgreens' mobile app for its Refill-By-Scan technology. (*See supra* § I.B; *see also* Ex. 36);

*Douglas Dynamics*, 717 F.3d at 1344-45 (finding that a permanent injunction was warranted

where the patent owner had dedicated significant amounts of time and money towards marketing,

sales, engineering and research and development, and had earned a reputation as an innovator).

The press has recognized Walgreens as having "pioneered prescriptions . . . in mobile

commerce." (Ex. 5.) Walgreens has also received numerous awards and extensive recognition for

its Refill-By-Scan technology in the health care, retail, smart phone, and other fields. (*See* Exs.

16-18.) In 2011, Refill-By-Scan received four Web Awards for Outstanding Achievement in

Web Development. (*See* Ex. 17.) Refill-By-Scan, along with two other features of Walgreens'

app, also won two Webby Awards in 2011. (*See* Ex. 16 at 1-2.) It was also named, along with

two other features, a Webby Award Nominee or Honoree in 2011 in two areas, including the

Best Use of Device Camera. (*See id.* at 3-4.) In 2012, Refill-By-Scan was named again, once by

itself and once along with one other feature, a Webby Award Honoree. (*See id.* at 5-6.) That

same year, the Walgreens app was the highest rated retail app among Apple devices and the sixth

highest among Android devices. (Ex. 37 at 4.)

      Defendants' rapid "me too" copying of refill by scan technology into their own apps (*see*

*supra* Intro. ¶¶ 5-8) evidences their early notice of Walgreens' success. Indeed, Mark Cullen, the

CEO of mscripts—whose business is partially built on copying Walgreens' patented Refill-By-

Scan technology for its own clients—stated that "[w]e're making money" and "[t]he only people

out there who are competing with us, there's one[,] Walgreens." (Ex. 15 at 9:11-13.)   Mr. Cullen

went on to declare that Walgreens' development and promotion of mobile pharmacy technology

"is the **best thing that ever happened to us**." (*Id.* at 9:14-15.) Cullen also tied Walgreens'

mobile pharmacy success to Refill-By-Scan. (*See id.* at 9:13-24.) After introducing its copy,

16

CVS touted its infringing refill by scan technology as a "**new mobile innovation**[]" that "makes refilling prescriptions **easier than ever**." (Ex. 8; Nettles Decl. App'x A-1 ¶ 6.) Rite Aid and Shopko have also experienced the benefits of customer goodwill misappropriated from Walgreens through their copycat refill by scan technology.

Defendants' infringement is causing Walgreens to lose customer and industry goodwill as a differentiated innovator. Defendants CVS and Rite Aid have characterized refill by scan technology as their own innovation, not Walgreens'. (Hyet Decl. at ¶ 27; Ex. 8 (CVS called its refill by scan copy a "new mobile innovation[]"); Nettles Decl. App'x A-1 ¶ 6 (CVS: "**Our scanning tool** makes refilling prescriptions easier than ever."); Ex. 38 (Rite Aid characterizing its refill by scan copy as representing "innovative technologies" that "offer[] one-click prescription refill scanning").) Certain third parties have credited CVS for implementing refill by scan. (*See* Ex. 39 at 2-3 (naming CVS Pharmacy app as the #1 Great Mobile App from Non-Tech Companies; citing, *inter alia*, the ability to "[s]can your prescription's barcode with [a] smartphone camera to have your medications refilled").) Defendants CVS, Rite Aid, Shopko, and mscripts now use Walgreens' patented Refill-By-Scan technology, making Walgreens' efforts to develop and cultivate lasting relationships with customers by providing innovative ways to refill prescriptions no longer exclusive to Walgreens. Indeed, despite the widespread praise of Walgreens' pioneering Refill-By-Scan technology, (*see*, *e.g.*, Exs. 5-7, 16-29, 36), by 2013, the ease of the refill process was the feature among which pharmacies (including Walgreens, CVS, Rite Aid, and others) were identified as the most similar. (*See* Hyet Decl. ¶ 26.)

> ### D.  Defendants' Infringement Interferes with Walgreens' Ability to Control Use and Dissemination of the Patented Technology

As a result of Defendants' infringement, Walgreens cannot control, absent an injunction, the use and dissemination of the patented Refill-By-Scan technology, irreparably harming

Walgreens. *See Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1456-57 (Fed. Cir. 1988) ("[B]ecause the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole."). Walgreens has deliberately chosen not to license the 530 patent to any competitors, and has no plans to do so. (*See* McCauley Decl. ¶ 31.) Yet, copying of the invention by Defendants has been rampant. Lack of an injunction deprives Walgreens of the ability to control its patented technology. For example, absent an injunction, mscripts may continue to churn out infringing apps for competing pharmacies, such as Shopko and other mscripts' clients.

E.     **Walgreens Has Expended Tremendous Resources on its Technology and Innovation, Including the Refill-By-Scan Technology**

Walgreens has expended substantial time and resources to develop innovative technology, including the Refill-By-Scan technology claimed by the 530 patent. For 2008 through 2013, Walgreens reported capital expenditures of between $258M to $581M per year, averaging over $350M annually, on system development costs for significant internally-developed software projects. (*See* Shaffer Decl. ¶ 25.) This includes costs toward development of the patented Refill-By-Scan technology. (*See id.*)  Walgreens' current, annual budget for mobile system development costs for significant internally-developed software projects is ███ (*Id.* ¶ 26.) Walgreens should be afforded the exclusivity granted under the 530 patent through a preliminary injunction, particularly where, as here, monetary damages could not fairly compensate it for the harm it is suffering by Defendants' infringement.

F.     **A Preliminary Injunction Will Deter Other Existing and Potential Infringers**

The number of infringers adopting knockoff refill by scan technology has been increasing because of Walgreens' success. Absent a preliminary injunction, other tag-along infringers will continue, or begin, to use the widely successful technology that Walgreens developed and

patented. Enjoining the Defendants from infringing the 530 patent will deter others (including

actual or potential clients of mscripts) from implementing infringing refill by scan technology.

### III.  THE BALANCE OF THE HARDSHIPS HEAVILY FAVORS WALGREENS

In contrast to the substantial resources expended by Walgreens and the irreparable harm

it now suffers, Defendants only incorporated refill by scan functionality into their apps after

Walgreens spent time and money to determine the market's acceptance of Walgreens' Refill-By-

Scan technology. (*See* Shaffer Decl. ¶¶ 25; Ex. 15 at 9:11-24.)

Walgreens seeks to enjoin *only the infringing refill by scan technology*. Defendants will

remain free to disseminate their mobile apps, which already allow their customers to refill

prescriptions by manual entry of prescription numbers. *See Douglas Dynamics*, 717 F.3d at 1345

(explaining that an infringer that could easily deliver a non-infringing alternative should "halt

infringement and pursue a lawful course of market conduct"). As Defendants' customers would

remain able to refill prescriptions using their apps, an injunction would only minimally harm the

Defendants. For example, mscripts' client Target, a competitor with over 1,500 pharmacies,

utilizes only refill by manual entry (with no scanning) in its mobile app. (*See* Exs. 40-41.)

The cost of Defendants' compliance with the requested injunction would be low.

Removal of the infringing technology, including testing, would take ███████████, at a cost

of less than approximately ████████████████████ (*See* McCauley Decl. ¶ 28.)

Walgreens has been diligent in protecting its rights. It successfully petitioned the Patent

Office to expedite examination of the application that issued as the 530 patent. (*See* Ex. 12 at

FH0001, 83-84, 234, 241, 394, 405.)  Three weeks after the 530 patent issued, Walgreens filed

this suit and, less than two months later, filed this motion. The balance of hardships weighs

heavily in Walgreens' favor.

## IV.     THE PUBLIC INTEREST DEMANDS PRELIMINARY INJUNCTIVE RELIEF

Courts have "long acknowledged the importance of the patent system in encouraging innovation." *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006). It is in the public's interest to enforce valid and infringed patents such as the 530 patent. And, as stated above, the pharmacy Defendants' customers will still be able to continue refilling prescriptions via the manual entry method already enabled in Defendants' apps. Thus, the public interest is not harmed by the requested injunction.

## V.     SECURITY

Walgreens will provide a reasonable security, should the Court find it necessary. The amount should be low in light of (1) the low cost to modify the apps to disable the refill by scan technology, (2) the fact that Defendants will remain able to receive refill orders through their apps via their customers' manual entry of a prescription number, and (3) the fact that the apps are never sold for money by at least the pharmacy Defendants.

## CONCLUSION

For the reasons set forth above and in the declarations submitted in support of its motion for a preliminary injunction, Walgreens respectfully requests that the Court preliminarily enjoin Defendants' infringing conduct to prevent further irreparable harm, as provided in the Proposed Order submitted herewith.


Date:  March 21, 2014

Of Counsel:

Timothy J. Malloy
Scott P. McBride
Daniel S. Stringfield
McAndrews, Held & Malloy, Ltd.

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
James L. Higgins (No. 5021)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600

20

500 West Madison Street, 34th Floor  
Chicago, Illinois  60661  
(312) 775-8000  
tmalloy@mcandrews-ip.com  
smcbride@mcandrews-ip.com  
dstringfield@mcandrews-ip.com

agaza@ycst.com  
jhiggins@ycst.com  

*Attorneys for Plaintiff*  
*Walgreen Co.*

## <u>CERTIFICATE OF SERVICE</u>

I, Anne Shea Gaza, Esquire, hereby certify that on March 21, 2014, I caused to be electronically filed a copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Jack B. Blumenfeld, Esquire
> Rodger D. Smith, II, Esquire
> Michael J. Flynn, Esquire
> Morris Nichols Arsht & Tunnell LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899-1347
> *jblumenfeld@mnat.com*
> *rsmith@mnat.com*
> *michael.flynn@mnat.com*
>
> *Attorneys for Defendants CVS Pharmacy, Inc.,*
> *Rite-Aid Corporation and Rite-Aid Hdqtrs. Corp.*
>
> Collins J. Seitz, Jr., Esquire
> Benjamin J. Schladweiler, Esquire
> Seitz Ross Aronstam & Moritz LLP
> 100 South West Street, Suite 400
> Wilmington, DE 19801
> *cseitz@seitzross.com*
> *bschladweiler@seitzross.com*
>
> *Attorneys for Defendants Shopko Stores Operating Co., LLC*
> *and mscripts, LLC*

I further certify that on March 21, 2014, I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel and on the following:

01:15174409.1

Adam L. Perlman, Esquire
David M. Krinsky, Esquire
Williams and Connolly
725 Twelfth Street, N.W.
Washington, DC  20005
*aperlman@wc.com*
*dkrinsky@wc.com*

*Attorneys for Defendant CVS Pharmacy, Inc.*

Jeremy A. Younkin, Esquire
Foley Hoag LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
*jyounkin@foleyhoag.com*

*Attorney for Defendants Shopko Stores Operating Co., LLC
and mscripts, LLC*

YOUNG CONAWAY STARGATT
  & TAYLOR, LLP

 */s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4073)
James L. Higgins (No. 5021)
Rodney Square
1000 N. King Street
Wilmington, DE 19801
302-571-6600
agaza@ycst.com
jhiggins@ycst.com

*Attorneys for Plaintiff*

Dated:  March 21, 2014